Cite as 2025 Ark. App. 276

# ARKANSAS COURT OF APPEALS
## DIVISION I
### No. CV-23-667

| | |
|---|---|
| MATTHEW FRITCHIE AND KATHERINE FRITCHIE <br><br> APPELLANTS <br><br> V. <br><br> KIPP HEARNE AND LISA HEARNE, INDIVIDUALLY; AND BIG SKY FAMILY TRUST DATED SEPTEMBER 18, 2020, KIPP G. HEARNE AND MARY E. ("LISA") HEARNE AS TRUSTEES OF THE BIG SKY FAMILY TRUST <br><br> APPELLEES | Opinion Delivered April 30, 2025 <br><br> APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CV-21-849] <br><br> HONORABLE DOUG MARTIN, JUDGE <br><br> AFFIRMED |

**MIKE MURPHY, Judge**

This appeal involves a dispute between neighbors about the construction of an in-ground pool. Appellants Matthew and Katherine Fritchie appeal a Washington County Circuit Court order granting appellees Kipp and Lisa Hearne; and Big Sky Family Trust dated September 18, 2020, Kipp G. Hearne and Mary E. ("Lisa") Hearne as Trustees of the Big Sky Family Trust (collectively "the Hearnes"), a permanent injunction requiring the Fritchies to remove all portions of their in-ground pool, retaining wall, and pool deck that are located within twenty-five feet of the property line between their property and the Hearnes' property. The Fritchies assert four points on appeal: (1) that the circuit court erred in finding that the in-ground pool was a "structure" subject to a neighborhood protective

covenant because it failed to strictly construe the covenant in favor of the unfettered use of land; (2) that even if the in-ground pool was a "structure," the issuance of a permanent injunction was improper; (3) that a Washington County setback restriction does not apply, and even if it did apply, the Hearnes did not have standing to bring their claim under it; and (4) that the circuit court erred in finding that the boundary line had not been moved through acquiescence. We affirm the circuit court's order.

I. *Background Facts*

The Hearnes and the Fritchies own adjacent properties in the Ridgemonte Estates subdivision in Washington County. In 2014, the Hearnes purchased lot 11, which has a street address of 2122 North Bridgeton Court. In February 2020, the Fritchies purchased lot 12, which has an address of 2086 North Bridgeton Court. There is no fence between the two properties. The subdivision, which is just outside the Fayetteville city limits, was platted in 1992 and is composed of large lots that range in size from one and a half acres to three acres. The subdivision is subject to a "Bill of Assurances and Protective Covenants for Ridgemont Estates [ ]" ("BAPC") and to the "Ridgemont Estates Rules and Regulations," both of which were filed with Washington County on September 4, 1992. The stated purpose of the BAPC is to ensure "beneficial development of the subdivision and in order to prevent any use which might tend to diminish the value or pleasurable enjoyment thereof." Paragraph five of the BAPC, which is at issue in the present case, states that

> [a]ll dwellings and structures located on the lots in said subdivision shall be no closer than 75 feet from right of way in front; 25 feet on sides and rear, with the exception

2

of lots 14, 15, [and] 16 which shall be no closer than 40 feet from right of way in front; 25 feet from right of way on sides and in rear.

In July 2020, the Fritchies contracted with Burton Pools & Spas for construction of an in-ground pool in their backyard. Construction on the pool began on December 9, 2020, and was completed in March 2021.

However, during construction, the Hearnes made verbal and written requests for construction to stop and asserted that the pool, pool deck, and retaining wall were being built in violation of both the twenty-five-foot BAPC setback restriction and a Washington County setback restriction, which requires a ten-foot minimum side setback from the property line. They also asserted that the retaining wall and concrete sidewalk around the perimeter of the pool extended across the property line and onto the Hearnes' property.

On January 27, the Hearnes sent a letter to the Fritchies alleging trespass violations as well as violations of the neighborhood and Washington County setback restrictions. The letter sought a "cease and desist" of all work until the Fritchies and Hearnes "execute a written agreement with regard to all aspects of the project and damages." The Fritchies responded, through their attorneys, on February 12. They stated that they wanted to resolve the matter amicably but asserted that when they began building their pool, they believed that the property line was located at the "maintenance line," which was ten to fifteen feet further into the Hearnes' property than the surveyed property line. They stated that because all parties (and their predecessors in interest) had been treating the maintenance line as the property line for at least seven years, that "under Arkansas law, the Maintenance Line is now the true and actual property line." The Fritchies further stated that "prior to and after

3

building the pool, Matt Fritchie contacted the Ridgemonte Estates' Property Owner's Association (the "POA") to ensure the pool did not violate the covenants and to obtain approval to build the pool." He reported that the POA stated that "they had no problem with Mr. Fritchie building the pool and he did not need their approval." The Fritchies further stated that, after a review of the BAPC, "it is our position that a pool would not fall under a 'structure' as that term is used in the covenants." Finally, the Fritchies provided a list of items that they were willing to do "in an effort to resolve this matter amicably," which included temporarily ceasing work on the retaining wall; having the property line redrawn and compensating the Hearnes for a reduction in their property line so that the pool and retaining wall no longer encroached on their property; paying for actual damage to their property; and sharing in the cost of landscape trees along the new resurveyed property line. The Hearnes responded on March 17, 2021, setting forth a counterproposal that contained additional details they considered necessary to reach a settlement without filing suit.

On April 22, the Hearnes filed a complaint and petition for injunction in circuit court against the Fritchies; Burton Pools & Spas, LLC; and Burton Pools & Spas, Inc. They alleged one count of trespass against the Fritchies for "building the retaining wall and deck structures on the Hearnes' property[,]" and by "allowing and/or causing their contractor, Burton, to dump 'spoils,' i.e., leftover dirt and trash from the construction of the Fritchies' inground pool, on the Hearnes' property." The Hearnes alleged one count of breach of the BAPC, "specifically the Setback Restriction, by building the inground pool, retaining wall, and attached deck structures within twenty-five feet (25') of the Hearnes' property." And they

4

alleged one count of trespass against Burton Pools & Spas, LLC; and Burton Pools & Spas, Inc. (collectively "Burton"), for "physically invad[ing] the Hearnes' real property during its construction of the inground pool, retaining wall, and deck structures for the Fritchies." The Hearnes sought an injunction ordering the Fritchies to remove (1) the retaining wall, deck, and spoils that trespass onto their property and (2) all portions of the in-ground pool, retaining wall, and deck structures located within setback restriction. They also sought damages and attorneys' fees.

On June 15, the Hearnes amended their complaint to add Burton Construction, LLC, as a defendant. The Hearnes filed a second amended complaint on January 6, 2022, adding Big Sky Family Trust dated September 18, 2020, Kipp and Lisa Hearne as Trustees (the "Trust"), as a plaintiff in the case as the Trust is the record owner of the Hearnes' property. The Hearnes also newly alleged that the Fritchies, aided by Burton, breached the Washington County (the "County") setback restriction—which prohibits the construction of any structure within ten feet of the side of property lines—by building the in-ground pool, retaining wall, and deck within ten feet of the Hearnes' property. The Fritchies denied violating the BAPC or the County setback and denied the trespass allegations. They asserted the affirmative defenses of adverse possession, boundary line by acquiescence, and lack of standing. Burton also denied the allegations and argued that the complaint should be dismissed for failure to state facts for which relief could be granted.

A bench trial was held on June 1, 2022.[1] At trial, Kipp Hearne testified that in 2020, the Hearnes were remodeling their Ridgemonte Estates house while living at a different house in Fayetteville. On December 9, 2020, Lisa was at their Ridgemonte Estates house, and she discovered that the Fritchies were putting an in-ground pool in their backyard. Lisa observed a construction staging area on the Hearnes' property and informed Burton employees that they were on the Hearnes' property. Matthew Fritchie came out of the house, and Lisa asked, "[W]hat is going on here? This is our property, and you have all of this equipment here, and I have lateral lines and irrigation through here. . . . This is unacceptable, and you're on our property, and where you're digging over here, it is too close to our property."

Kipp went to the house that night and saw no visible delineation of a property line. After returning several times and seeing no clearly marked property line, he hired Jorgensen and Associates, a surveying company, to mark the property lines. Jorgensen "staked [ ] out" the property line on January 8. When Kipp returned to the property four days later, he saw that a retaining wall had been built, which encroached over the property line.

At that point, he went over to the Fritchies' house to discuss the matter. According to Kipp, Matthew Fritchie was very apologetic and "said he made a mistake[.]" Kipp then testified as follows about his conversation with Matthew:

---

[1]The bench trial was on the Hearnes' claims against the Fritchies. It was the parties' understanding that the Hearnes and Burton defendants had reached a settlement before trial.

6

And I said "Matt, I can't believe that your contractor went to this effort to build this, you know, significant structure out here, and they didn't establish the property line." And – and Matt said, "No," he said, "it's not – "it's not – it's not their fault. It's my fault. It's in – it's in my contract. There's a provision in the contract that it's my responsibility to draw out a survey." So he said, "I" – he said, "I was just – I didn't want to spend the money. I wanted to save that money." Said, "I thought I knew where it was." And when I asked him – of course the conversation, I said, "Where" – "How did you know where your property line was?" His response to me was, "This is where my Realtor told me." We were standing – at that time we were standing at the street looking back out, and he said, "This is where my Realtor told me it was."

So I said, "So you didn't even" – "you didn't even have it surveyed when you bought the house?" No, he didn't. He didn't have it – it's never been surveyed. He's never had the house or lot surveyed, at that point, to that point. So that – that truly was an over – I mean, I was shocked. I mean, I just thought who – who would do – who would go to this level of effort without having, at some point at least, your property line identified?

Kipp testified that, at that point, his intent was to resolve the issue. Matthew told Kipp that he was planning to call Jorgensen about the survey and property line the next day.

The next day, January 13, however, following a confrontation between Lisa and Matthew, Kipp again reiterated to Matthew that he expected construction to stop. When that did not happen, the Hearnes' January 27 cease-and-desist letter followed.

Kipp testified that, on the basis of the surveyed property line, the Fritchies' pool extends nineteen and a half feet into the twenty-five-foot BAPC setback. It extends four and a half feet into the ten-foot Washington County setback. He testified that the pool deck extends eight inches over the Hearnes' property line, and the pool retaining wall extends about seven and a quarter feet over the property line. Kipp also testified that waste spoils—soil and rock—were deposited on the Hearnes' property during the construction. Kipp testified that the placement of the pool affects his enjoyment of his property, and he is unable

7

to create a buffer with trees because of the sewer-line location. Finally, Kipp believed the term "structure" as used in the BAPC setback includes the Fritchies' in-ground pool.

Several other witnesses testified on the Hearnes' behalf. Rosalie DiBrezzo, the subdivision's POA president, testified about the BAPC setback restrictions and that, in her opinion, an in-ground pool is a structure subject to those restrictions. Paul Chapman, a planner with the Washington County Planning Department, testified that it is the County's position that an in-ground pool constructed within ten feet of an adjacent neighbor's property line would violate the County's setback restriction.

Josh Moore, a construction manager with Burton, testified that he oversaw the construction of the Fritchies' pool. Moore discussed the property line with Matthew Fritchie at a preconstruction meeting in early December 2020. According to Moore, Matthew pointed to "two different mow lines as far as where they mow the grass[,]" but Moore testified that there was no fence, line of trees, or anything else placed on the land to show the property line between the Fritchies' lot and the Hearnes' lot. Moore testified that he told Matthew that there was a chance that, in order to construct the pool, Burton would be encroaching onto the Hearnes' property and that Matthew would need to get the Hearnes' permission for that. Moore testified that Matthew implied to him that he had already obtained the Hearnes' permission. Moore further testified that it was the Fritchies' responsibility to make sure that the pool was built according to any applicable restrictive covenants. When Moore was later informed that the pool wall was located on the Hearnes' property, Matthew told Moore "that it was his bad, he was wrong about the property line." But despite Moore's

8

concerns that he expressed to the Fritchies, Matthew wanted him to continue with construction. Finally, Moore testified that an in-ground pool is nonmovable and built with concrete and steel, and he considers an in-ground pool to be a structure.

Matthew Fritchie testified that when he purchased his Ridgemonte Estates home, he was aware that the neighborhood was subject to protective covenants. However, he did not actually read the BAPC, including its setback restrictions, until sometime in January 2021—when his pool was more than halfway completed. Matthew testified that he had been told about the county's ten-foot setback restriction by a Burton employee. He disagreed, however, that his in-ground pool was a "structure" subject to the BAPC or County setback restrictions. His understanding of a structure is "an upright building of some sort."

Matthew also acknowledged that there is a seven-foot by twelve-foot section of the pool retaining wall beyond the Hearnes' property line and that the pool deck extends about eight inches beyond the Hearnes' property line. He testified that the actual pool is about five and a half feet from the Hearnes' property line. He agreed that he does not own any property that is outside of lot 12 in the subdivision and that he does not own any of the property titled in the name of the Hearnes. He testified that he and his wife, Katherine, were ultimately responsible for where their pool was built and for building it in compliance with applicable rules, restrictions, and ordinances. He also agreed that he should have obtained a survey before starting construction on the pool and that his contract with Burton required him to do so but that he did not obtain one at that time. Matthew testified that he "was told where the [property] line was, [he] went with the line." According to him, "[t]he grass is

9

obviously different, and we've been doing it for about a year up to that point, and then the previous owners for the last 20 some odd years did the same thing."

Matthew testified that on the first day of pool construction, Lisa expressed concern about materials being poured onto her property. But he testified that January 12 was the first time that he had heard the Hearnes' concerns over the pool's location. Matthew had a conversation with Kipp on January 12 after Kipp had placed a string between two pins that Jorgensen's survey had identified as the property line. At that meeting, Matthew apologized to Kipp for not having done a survey before starting construction. Sometime after that, Matthew called Jorgensen and asked Jorgensen to put stakes down on the property line around the pool location, which confirmed that there was construction on the Hearnes' side of the property line. Matthew testified that he nonetheless continued construction because, at that point, it was a safety issue for his four children, ages six, five, three, and three. He said that the only additional work done after January 12 was the installation of a liner so that they could cover the top of the pool. He testified that he would not have wanted to build any portion of his pool project on the Hearnes' lot and, in hindsight, would have done things differently. But before January 2021, he believed that the entire project had been built solely in his own yard based on where he had been told the property line was and based on his maintenance of the yard on his side of that line for the year that he had lived there. According to Matthew, in his December 9 conversation with Lisa, she also thought the property line was located at the grass-maintenance line. The entire project—pool, deck, and retaining wall—were on the Fritchies' side of that maintenance line in what they believed to

be their own yard. Matthew testified that he spent more than $95,000 on construction of the pool.

Although he was aware of the neighborhood covenants before building the pool, Matthew testified that he and Katherine "weren't too concerned about it just because of all the covenants that had been broken in the neighborhood, so we knew that it was lax." He had observed breaches of the neighborhood covenants "all over the neighborhood." Matthew also discussed the pool with a neighbor on the POA, and "he said I was good."

Terri Dushan testified on the Fritchies' behalf. She has lived in the Ridgemonte Estates neighborhood almost twenty years and has served as the POA secretary for eighteen years. She testified that she has never known the POA to enforce its setback requirements, and it has "never once" enforced the requirements against a swimming pool. She was aware of many current BAPC violations, but she was not aware of any other setback-restriction violations. She testified that enforcement of the BAPC lies with each property owner.

Following arguments of counsel, the circuit court took the case under advisement and requested that the parties file simultaneous posttrial briefs. On July 27, the circuit court entered a final judgment in favor of the Hearnes and against Fritchies. On Count 1, the circuit court found that the Fritchies' in-ground pool violated the BAPC setback restriction and that the Hearnes were entitled to an injunction requiring the Fritchies to remove the portions of their in-ground pool located within twenty-five feet from the Hearnes' property line. On Count 2, the circuit court found that the Hearnes were entitled to enforce the County setback restriction against the Fritchies, but because the BAPC is more restrictive

11

than the county setback restriction, the court would enforce only the BAPC. On Count 3, the circuit court found that the Fritchies trespassed by having their contractor place the retaining wall, deck, grading, and spoils on the Hearnes' property without consent, and it determined that the Hearnes were entitled to an injunction requiring the Fritchies to remove these items from the Hearnes' property. It further found that the Fritchies failed to prove boundary by acquiescence, and it rejected the affirmative defenses that they asserted. The circuit court ordered the Fritchies to remove all portions of the pool, retaining wall, and deck located within twenty-five feet of the property line within 180 days from the date of the order, and it ordered them to remove all portions of the pool deck, retaining wall, and spoils located on the Hearnes' property within 180 days.

The Fritchies filed a timely notice of appeal on August 24, 2022.[2]

## II. *Points on Appeal*

For reversal, the Fritchies argue that (1) the circuit court erred in concluding that their in-ground pool was a structure subject to the BAPC; (2) even if an in-ground pool is a structure, the issuance of a permanent injunction was an improper remedy; (3) the Washington County setback is inapplicable, and even if it applied, the Hearnes did not have

---

[2]After briefs were filed in the original appeal, *Fritchie v. Hearne*, CV-22-672, the parties learned that the record did not reflect the dismissal of the Burton defendants, rendering the circuit court's July 2022 order nonfinal. The Fritchies moved to dismiss the appeal in February 2023, and this court granted that motion. On June 15, 2023, the circuit court entered an order dismissing the Burton defendants with prejudice. The Fritchies timely filed a notice of appeal on July 12, 2023. The current appeal followed.

standing to bring their claim under it; and (4) the circuit court erred in determining the setback distance because the boundary line had been moved through acquiescence.

A. Standard of Review

Because the issuance of a permanent injunction sounds in equity, our review is de novo. *Vera Lee Angel Revocable Tr. v. Jim O'Bryant & Kay O'Bryant Joint Revocable Tr.*, 2018 Ark. 38, at 5–6, 537 S.W.3d 254, 257. However, we review the circuit court's factual findings leading to the issuance of the injunction under the clearly erroneous standard. *Id.* at 6, 537 S.W.3d at 257. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *White v. McGowen*, 364 Ark. 520, 522, 222 S.W.3d 187, 189 (2006). Disputed facts and determinations of credibility are matters for the fact-finder. *Id.*

We have observed that restrictions upon the use of land are not favored in the law. *Acuna v. Watkins*, 2012 Ark. App. 564, at 9, 423 S.W.3d 670, 675. Further, a restrictive covenant will be strictly construed against limitations on the free use of land. *Id.* Thus, all doubts are resolved in favor of the unfettered use of land. *Id.* at 9, 423 S.W.3d at 676. Any restriction on the use of land must be clearly apparent in the language of the asserted covenant. *See id.* Where the language is clear and unambiguous, the parties will be confined to the meaning of the language employed, so long as the meaning does not defeat the plain and obvious purpose of the provision. *Id.* In addition, we have said that the general rule governing the interpretation, application, and enforcement of restrictive covenants is that the intention of the parties as shown by the covenant governs. *Id.*

13

B. In-Ground Pool as a "Structure"

For their first point, the Fritchies argue that the circuit court erred in determining that their in-ground pool is a "structure" covered by the BAPC setback restriction. They assert that the plain language of the BAPC does not clearly include in-ground pools within the term "structures" and, therefore, the doctrine of strict construction mandates that any ambiguities be resolved in their favor. The Hearnes respond that the circuit court did not err because the plain meaning of the word "structure" encompasses an in-ground pool.

In determining that the Fritchies' in-ground pool was subject to the neighborhood setback restrictions, the circuit court found that "[b]ased on the language contained in the Restrictive Covenants, an in-ground pool is a structure subject to these [setback] restrictions." It further concluded as follows:

> Our Supreme Court has held that the general rule governing the interpretation, application, and enforcement of restrictive covenants is that the intention of the parties as shown by the covenant governs. *Hays v. Watson*, 250 Ark. 589, 594, 466 S.W.2d 272, 275 (1971). The rule of strict construction is limited by the basic doctrine of taking the plain meaning of the language employed. *Id.* The Court finds that as used in the Restrictive Covenants, the term "structure" is a broad, catch-all term that encompasses any physical object constructed or built, such as pools, retaining walls, and decks. The Restrictive Covenants themselves demonstrate that the term "structure" is meant to be applied broadly; for example, in some paragraphs of the Restrictive Covenants, a "structure" is synonymous with an outbuilding or storage shed; in other paragraphs, the term "structure" is synonymous with a trailer, mobile home, tent, shack, or barn; and still, in other paragraphs, the term "structure" is synonymous with a communication mast or tower. [ ] In this case, the Defendants' in-ground pool was constructed out of concrete and steel, it is permanent, and it was designed and built by a licensed contractor according to specifications.

Again, the BAPC setback restriction states, "All dwellings and structures located on the lots in said subdivision shall be no closer than 75 feet from the right of way in front; 25

14

feet on the sides and rear[.]" For purposes of this appeal, unless an in-ground pool falls within the plain meaning of the term "structure," then the term must be strictly construed "against limitations on the free use of land," i.e., in the Fritchies' favor. *See Acuna*, 2012 Ark. App. 564, at 9, 423 S.W.3d at 675. The Fritchies assert that because the term "structure" is not defined within the BAPC to include in-ground pools, the circuit court erred by not strictly construing the term in their favor. We disagree with the Fritchies' argument that the term had to be defined within the BAPC to avoid strict construction.

In its findings, the circuit court noted that the rule of strict construction is limited by the basic doctrine of taking the plain meaning of the language employed. It found the term "structure" to be a "broad, catch-all term that encompasses any physical object constructed or built, such as pools, retaining walls, and decks." This finding is in line with the dictionary definitions of "structure." *See Structure, Black's Law Dictionary* (12th ed. 2024) (defining "structure" as "any construction, production, or piece of work artificially built up or composed of parts purposefully joined together"); Merriam-Webster.com, https://www.merriam-webster.com/dictionary/structure (accessed 21 Apr. 2025) (defining "structure" for purposes of this case as "something (such as a building) that is constructed"). Absent a statutory definition for a term, our supreme court has used a *Black's Law Dictionary* definition of a term in a statute to state its plain meaning. *See Calaway v. Prac. Mgmt. Servs., Inc.*, 2010 Ark. 432, at 4. Because the circuit court's finding on the plain meaning of "structure" is consistent with the *Black's Law Dictionary* and *Merriam-Webster* definitions of the term, we are not left with a firm conviction that a mistake has been committed. Thus,

15

we hold that the circuit court was not clearly erroneous in finding that the plain meaning of the term "structure" encompasses an in-ground pool.

The Fritchies also assert that the issue of whether an in-ground pool is a "structure" must be informed by other references to the term "structure" within the BAPC. For example, another provision within the BAPC states that "[n]o dwelling or structure constructed on any lot or lots, or parts thereof, shall have less than 2400 square feet of heated living area, exclusive of garages or porches." They further assert that the BAPC drafters intended "structures" to apply only to vertical improvements, not in-ground swimming pools. In support, they point to paragraph 9 of the BAPC, which provides that "[n]o out buildings, storage sheds or other structures shall be permitted on any lot" if such "structures materially detract from the appearance of the neighborhood." They also point to paragraph 17, which says "[n]o structure of a temporary character, trailer, mobile home, tent, shack, barn or other out building shall be created or used or allowed to exist on any lot." And paragraph 19 states that "[n]o communication mast, tower or structure may be installed on any said lot unless . . . the uppermost point of any such equipment not to be more than two feet above the highest point of the roof of the dwelling."

We are unpersuaded that use of the term "structures" in other parts of the BAPC limits its meaning in the setback restriction to exclude in-ground swimming pools. The circuit court addressed the use of "structure" in other parts of the BAPC:

> The Restrictive Covenants themselves demonstrate that the term "structure" is meant to be applied broadly; for example, in some paragraphs of the Restrictive Covenants, a "structure" is synonymous with an outbuilding or storage shed; in other paragraphs,

16

the term "structure" is synonymous with a trailer, mobile home, tent, shack, or barn; and still, in other paragraphs, the term "structure" is synonymous with a communication mast or tower. [ ] In this case, the Defendants' in-ground pool was constructed out of concrete and steel, it is permanent, and it was designed and built by a licensed contractor according to specifications.

We agree with the circuit court's conclusion "structure" is used broadly in the BAPC to encompass a number of different items constructed or built on the property.

The circuit court's finding is also supported by the neighborhood Environmental Control Committee's Rules and Regulations ("Rules and Regulations"), which are referenced in the BAPC, were introduced without objection at the trial below, and were enacted at the same time and date as the BAPC. The Rules and Regulations refer to the BAPC and require that construction plans for certain items be approved by committee before beginning construction. The construction plans for those items must "show[ ] structure location on the site . . . [and] setbacks." The Rules and Regulations provide a noninclusive list of items that require approval, and that list includes swimming pools. As the Hearnes point out, if the Rules and Regulations require that the construction plans for certain items include a "structure['s] location," then by providing a nonexhaustive list that includes swimming pools, the drafters clearly provided examples of items they considered to be structures. The Rules and Regulations further support the circuit court's findings on the issue.

Finally, the Fritchies argue that the circuit court incorrectly relied on witness testimony in concluding that swimming pools are "structures" under the BAPC because the covenants are to be construed using only the text in the document. Although multiple

17

witnesses testified about their belief that an in-ground pool was a structure, the circuit court expressly found that "[b]ased on the language contained in the Restrictive Covenants, an in-ground pool is a structure subject to these restrictions." There was nothing erroneous about its subsequent finding that "[c]redible testimony introduced at trial confirmed this."

For all of these reasons, we hold that the circuit court did not clearly err in finding that an in-ground pool fits within the meaning of "structure" for purposes of the setback provision of the BAPC. We affirm the circuit court's findings on this issue.

## C. Permanent Injunction

The Fritchies next argue that the circuit court erred in issuing a permanent injunction without balancing the equities which, the Fritchies argue, weigh in their favor. Their argument on this point is twofold. First, they argue that the circuit court erroneously relied on *Clifford Family Ltd. Liability Co. v. Cox*, 334 Ark. 64, 971 S.W.2d 769 (1998), to find that an injunction was the proper remedy here, but that *Clifford* was overruled by Arkansas Code Annotated section 18-11-501 (Repl. 2015). Second, they argue that a permanent injunction was improper under the doctrine of laches.

### 1. Clifford *and section 18-11-501*

In deciding to issue the permanent injunction, the circuit court ruled as follows:

> 8. Consistent with the Restrictive Covenants, under Arkansas law, the entry of an injunction is the remedy for the Defendants' violation of the Restrictive Covenants. *See Clifford Family Ltd. Liability Co. v. Cox*, 334 Ark. 64, 971 S.W.2d 769 (1998); *Hays v. Watson*, 250 Ark. 589, 466 S.W.2d 272 (1971); *Jernigan v. Baker*, 221 Ark. 54, 251 S.W.2d 999 (1952).

9. Therefore, on Count I of Plaintiffs' Second Amended Complaint, the Court concludes that the Plaintiffs are entitled to enforce the Restrictive Covenants against the Defendants in order to prevent the Defendants' violation of the Setback Restriction. Therefore, the Plaintiffs are entitled to an injunction requiring the Defendants to remove the portions of the Defendants' in-ground pool located within twenty-five (25) feet from the Plaintiffs' property line.

Our review of this point on appeal turns on *Clifford* and its continued viability in light of section 18-11-501. Like the present case, *Clifford* involved a dispute between adjacent neighbors about whether an item constructed in one neighbor's backyard violated a protective covenant. 334 Ark. at 65–66, 971 S.W.2d at 770–71. The Cliffords alleged that the court erred in not requiring the Coxes to remove a deck that they constructed on their property. *Id.* at 65, 971 S.W.2d at 770. Although the court found that the deck violated the setback provision of the neighborhood's protective covenants, it concluded that removal would be a harsh remedy where it was unable to discern any interference with the Cliffords' enjoyment of their property. *Id.* at 66–67, 971 S.W.2d at 771. The supreme court reversed and remanded the court's decision, holding that the language in the restrictive covenant was clear and that the court erred in examining the respective properties to determine whether the encroachment by the Coxes caused any interference with the Cliffords' enjoyment of their land. *Id.* at 68–69, 971 S.W.2d at 772. The court then remanded the matter to enforce the covenant by requiring the removal of the encroachment. *Id.* at 69, 971 S.W.2d at 772.

Additionally, section 18-11-501 states that

[c]ircuit judges are authorized to exercise their discretion to balance the equities between or among parties when considering whether to award injunctions or damages in cases involving encroachment of interior setback lines in residential subdivision restrictive covenants.

19

Ark. Code Ann. § 18-11-501. That statute was the codification of Act 1380 of 1999, § 1.

That Act contained an emergency clause that stated in pertinent part the following:

> It is hereby found and determined by the Eighty-second General Assembly that there is an immediate and urgent need for revision of the current state law concerning enforcement of interior setback restrictions in residential restrictive covenants. Recent court decisions appear to hold that any violation of such an interior setback restriction, no matter how slight, requires that the structure or part thereof built in violation of the setback restriction be removed. Such an interpretation of the law regarding interior setback restrictions in residential restrictive covenants will result in the needless destruction of property, with resultant displacement of homeowners and their families and substantial expenditures to correct setback restriction violations which, in actuality, cause little or no damage to adjacent land owners. Therefore, an emergency is declared to exist and this act being immediately necessary for the preservation of the public peace, health and safety shall become effective on the date of its approval by the Governor.

Act 1380 of 1999, § 7.

The Fritchies contend that Arkansas Code Annotated section 18-11-501 is a complete repudiation of *Clifford* as it pertains to interior-setback lines in residential subdivision restrictive covenants. They assert that rather than being bound by strict adherence to the interior-setback language, a circuit court is now permitted to balance the equities when considering whether to award injunctions or damages. The Hearnes respond that, even in light of section 18-11-501, the circuit court was not required to balance the equities before issuing a permanent injunction, but if balancing the equities had been required, then it did so here.[3]

---

[3] The parties note that our supreme court previously addressed the effect of section 18-11-501 on *Clifford* in *Cochran v. Bentley*, 369 Ark. 159, 251 S.W.3d 253 (2007). In *Cochran*, our supreme court was asked to overrule *Clifford* and refused to do so. *Id.* at 174, 251 S.W.3d

Although it is unclear from the circuit court's order that it balanced the equities in this case, the plain language of section 18-11-501 does not require a circuit court to balance the equities in deciding to issue a permanent injunction. That section plainly states that "[c]ircuit judges are *authorized* to exercise their discretion to balance the equities between or among parties when considering whether to award injunctions or damages in cases involving encroachment of interior setback lines in residential subdivision restrictive covenants." *Id.* (emphasis added). "Authorized" means "sanctioned by authority; having or done with legal or official approval." Merriam-Webster.com, https://www.merriam-webster.com/dictionary/authorized (accessed 21 Apr. 2025). It does not mean "required." If the General Assembly had intended to require circuit courts to balance the equities before issuing an injunction for violations of interior-setback restrictions, then it would have said so. But it did not. Therefore, we hold that Act 1380 of 1999 was not a complete repudiation of *Clifford* as to interior-setback restrictions, and we affirm the circuit court's grant of an injunction ordering the Fritchies to remove the portions of their in-ground pool located within twenty-five feet from the Hearnes' property line.

## 2. *Laches*

The Fritchies next argue that the circuit court clearly erred in finding the defense of laches inapplicable in this case. They argue the right to enforce the setback restriction in the

---

at 265. It also clarified that "*Clifford* does not dictate removal of a violating structure in every instance." *Id.* However, *Cochran* was not a case about interior-setback provisions but about whether a detached garage violated the size and outbuilding restrictions in a protective covenant, so it is distinguishable from the present case in that respect.

21

BAPC was lost through years of the POA's refusal to enforce multiple other setback violations throughout the neighborhood.

The right to enforce a restrictive agreement may be lost by laches or acquiescence, especially when one incurs expenditures. *See Cochran*, 369 Ark. at 170, 251 S.W.3d at 263. The doctrine of laches is based on equitable principles that are premised on some detrimental change in position made in reliance upon the action or inaction of the other party. *Id.* It is based on the assumption that the party to whom laches is imputed has knowledge of his rights and the opportunity to assert them; that by reason of his delay, some adverse party has good reason to believe those rights are worthless or have been abandoned; and that because of a change of conditions during this delay, it would be unjust to the latter to permit him to assert them. *Id.* Laches requires a demonstration of prejudice to the party alleging it as a defense resulting from a plaintiff's delay in pursuing a claim. *Id.*

In addition, the application of the doctrine of laches to each case depends on its particular circumstances. *See Self v. Self*, 319 Ark. 632, 638, 893 S.W.2d 775, 778 (1995). As was the case with estoppel, laches requires a showing that the party asserting the doctrine has suffered or changed its position as a result of the lack of diligence or delay in assertion of rights. *See Cochran*, 369 Ark. at 170, 251 S.W.3d at 263.

> In rejecting their reliance on the defense of laches, the circuit court found that
>
> [f]or laches to apply, there must be some delay or inaction in asserting one's rights, and the other party must have reasonably relied on such delay or inaction to their detriment and further prejudiced by it. *Goforth v. Smith*, 338 Ark. 65, 78, 991 S.W.2d 579, 587 (1999); *Massongill v. County of Scott*, 337 Ark. 281, 991 S.W.2d 105 (1999). This Court finds that the Plaintiffs, upon learning of the encroachments, immediately

protested to the Defendants. The evidence further shows that the Plaintiffs quickly and diligently employed a surveyor to establish the corners of the property line. Additionally, the Plaintiffs presented evidence that demonstrates they repeatedly objected and requested that the Defendants stop construction of their pool and that the Defendants were aware of these repeated objections and requests. Defendants have failed to demonstrate delay or inaction by the Plaintiffs. They have also failed to show that they detrimentally relied on any inaction or delay by the Plaintiffs. The affirmative defense of laches has not been proven by the Defendants.

The Fritchies' argument focuses on other setback violations within the neighborhood that had not been enforced by the neighborhood POA. But the doctrine of laches is based on some detrimental change in position made in reliance upon the action or inaction of the other party. *See Cochran*, 369 Ark. at 170, 251 S.W.3d at 263. Here, the Hearnes are the other party, not the POA. As the circuit court correctly found, the Hearnes repeatedly objected to the location of the Fritchies' pool and its continued construction. Thus, we see no clear error in the circuit court's findings on laches, and we affirm on this point.

D. Washington County Setback

The Fritchies next argue that the circuit court erred in concluding that they violated the Washington County setback restriction. They contend that, pursuant to Arkansas Code Annotated section 14-56-413 (Supp. 2023), the city of Fayetteville, not Washington County, had jurisdiction to regulate land use in the Ridgemonte Estates neighborhood. They argue in the alternative that even if the Washington County setback applied, the circuit court erred in finding that the Hearnes had standing to bring a claim to enforce it.

On the Washington County setback, the circuit court concluded that the Hearnes were entitled to enforce the restriction, which prohibited the construction of any structure

23

within ten feet of each side of a residential lot, against the Fritchies. But the circuit court also found that because the BAPC was more restrictive (twenty-five feet) than the County's ten-foot restriction, it enforced only the BAPC restriction and not the County restriction. Because we affirm on the twenty-five-foot BAPC setback violation, we need not discuss the Fritchies' argument on the ten-foot County setback restriction.

## E. Boundary by Acquiescence

In their last point on appeal, the Fritchies argue that the circuit court erred in finding trespass because the property line had been moved through acquiescence. They argue that they had acquired a small strip of the Hearnes' yard when they, their predecessors, and the Hearnes observed a line, referred to at trial as the "mow line" or "maintenance line," that is easily identifiable by the change in grass, along with a tree that sits on its southern edge. The Hearnes respond that the one year in which the Fritchies had mowed along a certain line was insufficient to establish a boundary by acquiescence, that there was no definitive dividing line between the properties by which to establish such a boundary, and that Matthew Fritchie's testimony itself defeats their boundary-by-acquiescence claim.

In *Myers v. Yingling*, 372 Ark. 523, 527, 279 S.W.3d 83, 87 (2008), our supreme court held that "[w]henever adjoining landowners tacitly accept a fence line or other monument as the visible evidence of their dividing line and thus apparently consent to that line, it becomes the boundary by acquiescence." A boundary line by acquiescence is inferred from the conduct of the landowners over many years that implies the existence of an agreement about the location of the boundary line; in such circumstances, the adjoining landowners

and their grantees are precluded from claiming that the boundary so recognized and acquiesced in is not the true one, although it may not be. *Durham v. McCone*, 2018 Ark. App. 392, at 10, 555 S.W.3d 907, 912. The period of acquiescence need not last for a specific length of time, but it must be for "many years" or a "long period of time" sufficient to sustain the inference that there has been an agreement concerning the location of the boundary line. *Jennings v. Burford*, 60 Ark. App. 27, 31, 958 S.W.2d 12, 14 (1997). A boundary by acquiescence is usually represented by a fence, a turnrow, a lane, a ditch, or some other monument tacitly accepted as visible evidence of a dividing line. *Durham*, 2018 Ark. App. 392, at 10, 555 S.W.3d at 912. A boundary line by acquiescence may exist without the necessity of a prior dispute. *Id.* Because the location of a boundary is a disputed question of fact, we will affirm the circuit court's finding unless it is clearly against the preponderance of the evidence. *Id.* at 3, 555 S.W.3d at 909. In reviewing a circuit court's findings of fact, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

On the Fritchies' claim of boundary by acquiescence, the circuit court found that

[t]he testimony of Defendant Matthew Fritchie demonstrates that there was no implied existence of an agreement about the location of the property line. He testified that whatever property the Plaintiffs own of Lot 11 pursuant to the Plat is what the Plaintiffs own, and whatever property the Defendants own of Lot 12 pursuant to the Plat is what the Defendants own. He also agreed that the true boundary line is the lot line shown on the Plat. Mr. Fritchie further conceded that the Defendants were not claiming ownership of any of the property owned by the Plaintiffs. In addition, Mr. Fritchie admitted that there was only one property line—the one shown on the Plat. Moreover, one year of mowing does not equate to "many years." In sum, the evidence leads to the clear conclusion that the doctrine of boundary by acquiescence does not apply in this case.

25

We see no error in the rejection of the boundary-by-acquiescence argument. It is significant, in our view, that Matthew acknowledged not getting a survey when he purchased his property or before pool construction began. When asked if there was any way to tell where one lot ended and the next began without a survey, he responded, "I guess not exactly, yeah." He pointed to a "mow line" where he was told that the boundary was and testified that he "went with the line. The grass is obviously different, and we've been doing it for about a year up to that point, and then the previous owners for the last 20 some odd years did the same thing." Matthew also agreed that he did not own any property outside the plotted lines on lot 12 and that he did not own any of the property titled in the Hearnes' name.

Although the Fritchies sought to prove boundary by acquiescence for an area that included a portion of the Hearnes' property, Matthew simultaneously agreed that he did not own any of the Hearnes' property in lot 11. And although he testified that he had mowed up to the "mow line" for a year, he also admitted that there was no way to tell where one lot ended and the next began without a survey. He claimed that the previous owners of his property also had used the "mow line" as the property line, but he did not present testimony from the previous owners at trial. In this circumstance, we hold that the circuit court's findings on this issue are not clearly against the preponderance of the evidence, and we affirm its rejection of the Fritchies' boundary-by-acquiescence claim.

III. *Conclusion*

26

For the reasons stated above, we affirm the circuit court's order.

KLAPPENBACH, C.J., and ABRAMSON, J., agree.

*RMP LLP*, by: *Timothy C. Hutchinson* and *Mallory Shamoon*, for appellants.

*Conner & Winters, LLP*, by: *Todd P. Lewis*, for appellees.